FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

00 JAN 27 AM 11: 44

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| EARL McGEE and ELOISE McGEE, | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | CV98-H-2989-NE |
| | ) | |
| NATIONAL EGG PRODUCTS COMPANY | ) | |
| (NEPCO) and TYSON FOODS, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**ENTERED**

JAN 2 7 2000

| | |
|---|---|
| NATIONAL EGG PRODUCTS COMPANY | ) |
| (NEPCO), | ) |
| | ) |
| COUNTER-CLAIMANT, | ) |
| | ) |
| VS. | ) |
| | ) |
| EARL McGEE, | ) |
| | ) |
| COUNTER-DEFENDANT. | ) |

## MEMORANDUM OF DECISION

The Court has before it the July 19, 1998 motion of

defendants National Egg Products Company ("NEPCO") and Tyson

Foods, Inc. ("Tyson") for summary judgment.  Pursuant to the

Court's July 20, 1998 order, the motion was deemed submitted,

without oral argument, on August 17, 1999.[1]

---

[1] In its order of August 4, 1999, the Court modified its
July 20, 1998 order to allow the plaintiffs Earl and Eloise McGee

31

## I. Procedural History

Plaintiffs Earl McGee and Eloise McGee (collectively "the McGees") commenced this action in the Circuit Court of Jackson County, Alabama on October 28, 1998 by filing a complaint alleging three counts of breach of contract, one count of breach of a duty implied by law, one count of negligence, one count of intentional infliction of emotional distress,[2] and one count of nuisance.  (See Compl. ¶¶ 27, 29-30, 31, 34, 37, 38, 46.) Plaintiffs contend that their claims against the defendants arose from the collapse of one of the plaintiffs' chicken houses and the subsequent death of approximately 17,000 chickens.  (See Compl. ¶¶ 10-26.)  In addition to NEPCO and Tyson, the complaint also named Freddy Early, a NEPCO field representative, as a defendant; Early was eventually dismissed without prejudice. (See Jan. 8, 1999 Order 4.)  NEPCO removed the case to this Court on December 1, 1998, and on December 2, 1998 filed a counterclaim against Earl McGee for breach of contract.  (See Countercl. ¶¶

_____

until September 15, 1999 to submit their brief and evidence in opposition to the defendants' motion for summary judgment.

[2] In its order of January 8, 1999, this Court dismissed the intentional infliction of emotional distress claim without prejudice as to Freddy Early and with prejudice as to NEPCO and Tyson.  Consequently, this claim is no longer before the Court.

2

11-12.)  Later, on June 23, 1999, NEPCO moved for leave to amend
its counterclaim to include a claim for indemnification, which
motion was granted.  (See June 23, 1999 Mot. ¶¶ 2-3; July 8, 1999
Order 2.)

On July 19, 1999, the defendants moved for summary judgment
as to the McGees' claims and NEPCO moved for summary judgment as
to its counterclaims.  The defendants' motion for summary
judgment asserts that no genuine issues of material fact exist
and that defendants are entitled to judgment as a matter of law
on all of the McGees' claims and that NEPCO is entitled to
judgment as a matter of law on both of its counterclaims.  (See
Defs.' Mot. Summ. J. 1.)  In support of summary judgment, the
defendants also filed a brief and as well as evidentiary
submissions[3] with their July 19, 1999 motion.  On September 7,
1999, plaintiffs filed a brief and evidentiary submissions[4] in

---

[3] In support of their motion for summary judgment, the
defendants submitted the following evidence:  a copy of the
Market Egg Contract between NEPCO's predecessor and Earl McGee,
excerpts from the June 17, 1999 deposition of Earl McGee, and
excerpts from the June 17, 1999 deposition of Freddy Early.

[4] In opposition to the motion for summary judgment, the
plaintiffs submitted the following evidence:  the July 28, 1999
affidavit of Earl McGee, the June 17, 1999 deposition of Earl
McGee, the June 17, 1999 deposition of Johnny Jacobs, the August
16, 1999 deposition of Johnny Jacobs, the June 17, 1999
deposition of Eloise McGee, and the June 17, 1999 deposition of

3

opposition to the defendants' motion for summary judgment.  In

their opposition brief, the plaintiffs assert that summary

judgment in favor of NEPCO on its counterclaims is improper

because, if no material issues of fact remain, Earl McGee (rather

than NEPCO) is entitled to judgment as a matter of law on the

counterclaims.[5]  (See Pls.' Br. 1.)  The Court takes the

plaintiffs' assertion as a cross-motion for summary judgment as

to the counterclaims and will consider the cross-motion alongside

the defendants' summary judgment motion.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary

judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment

as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  The party asking for summary judgment always bears the

initial responsibility of informing the court of the basis for

---

Freddy Early.

[5] As an alternative argument, plaintiffs' brief asserts that
material issues of fact remain as to the counterclaims.  (See
Pls.' Br. 1.)

4

its motion and identifying those portions of the pleadings or
filings which it believes demonstrate the absence of a genuine
issue of material fact.  Id. at 323.  Once the moving party has
met his burden, Rule 56(e) requires the nonmoving party to go
beyond the pleadings and by his own affidavits, or by the
depositions, answers to interrogatories, and admissions of file,
designate specific facts showing that there is a genuine issue
for trial.  Id. at 324.

        The substantive law will identify which facts are material
and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986).  All reasonable doubts about the facts and
all justifiable inferences are resolved in favor of the non-
movant.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th
Cir. 1993).  A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248.  If the evidence is merely colorable,
or is not significantly probative, summary judgment may be
granted.  Id. at 249.

        The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears
the burden of proof on the issue at trial.  See Fitzpatrick, 2
F.3d at 1115-17 (citing United States v. Four Parcels of Real

Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the

moving party bears the burden of proof at trial, then it can only

meet its initial burden on summary judgment by coming forward

with positive evidence demonstrating the absence of a genuine

issue of material fact; i.e. facts that would entitle it to a

directed verdict if not controverted at trial.  Fitzpatrick, 2

F.3d at 1115.  Once the moving party makes such a showing, the

burden shifts to the non-moving party to produce significant,

probative evidence demonstrating a genuine issue for trial.

    If the moving party does not bear the burden of proof at

trial, it can satisfy its initial burden on summary judgment in

either of two ways.  First, the moving party may produce

affirmative evidence negating a material fact, thus demonstrating

that the non-moving party will be unable to prove its case at

trial.  Once the moving party satisfies its burden using this

method, the non-moving party must respond with positive evidence

sufficient to resist a motion for directed verdict at trial.

    The second method by which the moving party who does not

bear the burden of proof at trial can satisfy its initial burden

on summary judgment is to affirmatively show the absence of

evidence in the record to support a judgment for the non-moving

party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's
claim; it simply requires the movant to point out to the district
court that there is an absence of evidence to support the non-
moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the
movant meets its initial burden by using this second method, the
non-moving party may either point out to the court record
evidence, overlooked or ignored by the movant, sufficient to
withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts

As noted previously, the plaintiffs' claims in this case
arose from the collapse of one of the plaintiffs' chicken houses
and the subsequent death of approximately 17,000 chickens which
had been kept in the damaged chicken house.  (See Compl. ¶¶ 10-
26.)  The chickens were being kept by the McGees pursuant to an
August 1, 1993 Market Egg Contract between Earl McGee and the

7

Farm Fresh Eggs Division of Hudson Foods, Inc. (<u>See</u> Ex. to
Compl. 1 [hereinafter Contract].)  Farm Fresh Eggs was the
predecessor to NEPCO, which was purchased by Tyson in January of
1998.  (<u>See</u> Compl. ¶¶ 7, 9.)

The Contract provided that Farm Fresh Eggs (NEPCO), referred
to as the Producer, would supply Mr. McGee, referred to as the
Contractor, with 40,725 chickens as well the necessary feed,
drugs, and sanitary supplies to raise the chickens as laying
hens.  (<u>See</u> Contract ¶ A1.)  The Contract also provided that the
Producer (NEPCO) would pay the Contractor (McGee) at certain
specified rates depending upon the level of egg production and
whether the flock was molting.  (<u>See</u> Contract ¶ A2.)  Mr. McGee
was "[t]o furnish land, building, labor, litter, lights, water,
heat and all equipment and facilities needed to keep the birds
and produce eggs."  (Contract ¶ B1.)  He also agreed to "give
[his] best care and attention to the birds supplied by [Farm
Fresh Eggs (NEPCO)]."  (Contract ¶ B5.)  In addition, the
Contract provided that all live chickens were the property of the
Producer (NEPCO) and that all dead chickens were the property of
the Contractor (McGee), who was to be responsible for disposal of
the dead poultry.  (<u>See</u> Contract ¶ C4.)

In accordance with the Contract, the chickens were delivered

8

to the plaintiffs' farm, where they were kept in two separate chicken houses, each house holding approximately 20,000 birds. (See Compl. ¶ 8.)  In early February of 1998, the roof of plaintiffs' number two chicken house collapsed, either from high winds or from ice accumulation.  (Compare Compl. ¶ 10 with Earl McGee Dep. 40.)  The feathered inhabitants of the coop perhaps felt a bit like Henny Penny and Chicken Little as the gable fell, first, hitting the chicken cages and, then, breaking the ceiling joists, ultimately causing the roof to cave inward.  (See Earl McGee Dep. 41, 45.)  At the time, the house was about twenty years old.  (See Earl McGee Dep. 24-25.)

Although the roof caved inward, it was prevented from falling completely to the ground by the outer walls of the chicken house.  Following the collapse, the roof was positioned in a downward "V" above the chicken house floor.  (See Earl McGee Dep. 44-45.)  Mr. McGee immediately inspected the damage and determined that no chickens had died in the accident; at the very least, no dead chickens were visible.  (See Earl McGee Dep. 47, 50-51.)  Although the chickens had apparently survived, the electricity and lights were not working, the feeders ceased operating, and the water line supplying the automatic waterers was broken.  (See Earl McGee Dep. 53-56.)  This damage to the

9

house rendered it nonfunctional for egg production.  (See Compl.
¶ 11.)

No attempts were made by Mr. McGee to remove the chickens
from the wrecked house himself.  Instead, he telephoned Freddy
Early, the local NEPCO field man.  Early asked McGee what he
intended to do with the chickens and when McGee informed Early
that the chickens were the property of Tyson, Early indicated
that he would come to the McGees' farm promptly.  (See Earl McGee
Dep. 51-52.)  When Early arrived to inspect the damage, Mr. McGee
stated that he intended to remove the collapsed roof and begin
rebuilding the damaged chicken house, but Early instructed McGee
not to remove the roof yet.  (See Earl McGee Dep. 57-58.)  Early
wished first to remove those chickens that could be reached
easily.  (See Earl McGee Dep. 58.)

Roughly 2,200 chickens were removed the first day and
transferred to the McGees' other chicken house.  (See Earl McGee
Dep. 59-62.)  On the next day, a crew of chicken catchers was
sent to the McGees' farm to slaughter the remaining chickens and
load the carcasses into a dump truck that would deliver the dead
birds to a rendering plant.  Eight hundred chickens were killed
and loaded before the crew quit.  (See Earl McGee Dep. 73-74, 76-
77.)  No more live chickens were removed from the house (see

10

McGee Dep. 77), although Mr. McGee estimated that at least 8,000 to 10,000 of the 20,000 to 21,000 chickens could have been caught easily and safely, without having to remove the collapsed roof. (See Earl McGee Dep. 67.)  Approximately 17,500 chickens remained in the house.  (See Earl McGee Dep. 83.)

Not less than twice, Early, at a minimum, suggested that McGee not undertake any immediate attempts to remove the damaged roof or rescue the remaining chickens and simply close the chicken house until the birds were dead; Early later stated that he believed that the birds would have had minimal salvage value or would have died from the inclement conditions and lack of water and food by the time the roof could be removed.  (See Earl McGee Dep. 68-70, 76, 78-79; Freddy Early Dep. 22-24, 29-30.)  As mentioned before, the feeders and water line had been broken by the collapse of the roof.  (See Earl McGee Dep. 56.)  After the collapse of the chicken house roof, NEPCO removed the remaining feed from the bins (see Earl McGee Dep. 56), and Mr. McGee did not supply the chickens with any feed at his own expense.  (See Earl McGee Dep. 56, 80.)  Even had feed been available, no way existed to feed the chickens because of the broken feeders.  (See Earl McGee Dep. 56, 81.)  After three weeks, the chickens began to die in large numbers as a result of starvation.  Three months

11

after the collapse of the roof, only 41 chickens remained alive.
(See Earl McGee Dep. 82.)

By May of 1998, the thousands of dead chickens had begun to
decay, producing a noticeable odor and attracting flies as well
as complaints. (See Earl McGee Dep. 100-02,109-11.)  NEPCO
management then learned of the conditions on the plaintiffs' farm
and assigned Early to handle the situation. (See Earl McGee Dep.
100-01; June 17, 1999 Johnny Jacobs Dep. 30, 36-37; Freddy Early
Dep. 32-33.)  In response, Early requested that Mr. McGee remove
the fallen roof, and McGee complied. (See Earl McGee Dep. 100-
03; Freddy Early Dep. 32-33, 37.)  The clearing of the roof
debris began in early June and took three weeks to complete.
(See Earl McGee Dep. 70, 99, 103-04; Freddy Early Dep. 26.)
However, after the roof had been removed, no attempt was made by
either NEPCO or McGee to dispose of the dead chickens, although
Mr. McGee was licensed to dispose of chicken carcasses through
incineration and possessed an incinerator. (See Earl McGee Dep.
109, 113-14, 116-17.)  Mr. McGee claimed that he lacked the
necessary funds, $15,000 to $20,000.00, that would be required at
that point to properly dispose of the rotten chicken carcasses
and bury the ruined chicken house and equipment. (See Earl McGee
Dep. 109, 114.)  No disposal work had been undertaken as late as

June of 1999.  (<u>See</u> Earl McGee Dep. 109.)

### IV. Applicable Substantive Law and Analysis

Forty years ago, Judge Friendly, then sitting on the United

States District Court for the Southern District of New York,

asked and answered that seemingly ageless legal question, "[W]hat

is chicken?"  <u>Frigaliment Importing Co. v. B.N.S. Int'l Sales</u>

<u>Corp.</u>, 190 F. Supp. 116, 117 (S.D.N.Y. 1960).  That issue having

been settled, the litigants in this case have found new corners

of the avian legal world to explore.  The plaintiffs offer for

this Court's resolution the next two great questions in poultry

jurisprudence, which the Court irreverently phrases as "Why did

the chicken not cross the road?" and "Whose dead chicken is it,

anyway?"[6]  Not to be outdone, defendant NEPCO has responded

through its initial counterclaim with what the Court poses as the

slightly altered musical question, "How much for that dead

chicken in the window?"  NEPCO also seeks reimbursement for

certain of its legal expenses incurred in defending against

plaintiffs' suit, which could amount to a considerable pile of

scratch.  After briefly addressing the controlling law, the Court

_____

[6] The plaintiffs' second question should not be confused
with the issues in <u>A.L.A. Schechter Poultry Corp. v. United</u>
<u>States</u>, 295 U.S. 495 (1935), which merely incidentally inquired,
"Whose sick chicken is it, anyway?"

will turn to the parties' claims.

## 1. Controlling Law

The plaintiffs originally filed suit in Alabama state court
and the litigation was subsequently removed to this Court
pursuant to 28 U.S.C. § 1441, which provides generally for
removal of cases over which the district court would have
original jurisdiction. See 28 U.S.C. § 1441(a) (1994). The
basis for original federal court jurisdiction in this case is
diversity of citizenship under 28 U.S.C. § 1332. (See Removal
Notice ¶ 3.) In substantive matters, a federal court sitting in
diversity is to apply the appropriate state's law. See Erie R.R.
Co. v. Tompkins, 304 U.S. 64, 78 (1938). Alabama applies the
doctrine of lex loci to both contract and tort claims. See Brown
Mach. Works & Supply, Inc. v. Insurance Co. of N. Am., Inc., 951
F. Supp. 988, 992 (M.D. Ala. 1996) (citing Harrison v. Insurance
Co. of N. Am., 318 So. 2d 253 (Ala. 1975)) (contract claims);
Fitts v. Minnesota Mining & Mfg. Co., 581 So. 2d 819, 820, 823
(Ala. 1991) (tort cases); Macey v. Crum, 30 So. 2d 666, 669 (Ala.
1947) (contract cases). In the present case, contract formation
and all other key events, actions, and alleged inactions occurred
in Alabama. The parties themselves have apparently determined
that Alabama law should apply, as they have raised no question of

14

the choice of laws and have relied upon this state's law throughout their briefs.  Therefore, the Court will determine this controversy using the laws of Alabama.

## 2.  Plaintiffs' Claims

Six of the plaintiffs' seven original counts remain before the Court.[7]  The first two remaining claims, breach of contract to pay for services rendered and breach of a duty implied by law (under the criminal animal cruelty statute), may be dispensed with quickly and are addressed in the following section.  (See Compl. ¶¶ 27, 29-30.)  The next three claims, breach of contract, breach of implied or constructive contract, and negligent performance of contractual duties, all relate to the plaintiffs' allegations that the defendants wrongfully failed to remove from the damaged chicken house the birds which survived the collapse of the roof.  (See Compl. ¶¶ 31, 34, 37.)  The final count alleges that the defendants created a nuisance in not removing the dead chickens from the plaintiffs' farm.  (See Compl. ¶¶ 46-47.)  Defendants assert that summary judgment in their favor is warranted on all of plaintiffs' remaining claims.  (See Defs.' Mot. Summ. J. 1.)  The Court will now consider the propriety of

---

[7]  The Court dismissed plaintiffs' outrage claim in January of 1999.  (See Jan. 8, 1999 Order 4.)

summary judgment on each claim, in turn.

**A.  Breach of Contract (Count I) and Breach of a Duty Implied by Law (Count II)**

The first two counts in plaintiffs' complaint assert claims for breach of contract and for breach of a duty implied by law. (See Compl. ¶¶ 27, 29-30.)  In Count I, plaintiffs allege a breach of contract arising from the defendants failure to pay the plaintiffs for the care of the chickens following the collapse of the chicken house roof.  (See Compl. ¶ 27.)  In Count II, the plaintiff claim that defendants violated section 13A-11-14 of the Alabama Code, and in doing so also breached a duty implied by law to remove the live chickens from plaintiffs' property after the collapse of the roof.  (See Compl. ¶¶ 29-30.)  Plaintiffs have chosen not to oppose summary judgment on these claims (see Pls.' Br. 1), and, consequently, the Court's discussion of these issues will be brief.

Considering the plaintiff's initial breach of contract claim, the Court finds that summary judgment in favor of the defendants is proper because plaintiffs could not succeed on their claim at trial.  "A breach of contract is defined as a 'failure, without legal excuse, to perform any promise which forms the whole or part of a contract.'"  Irvin v. Community

16

Bank, 717 So. 2d 369, 371 (Ala. Čiv. App. 1997) (quoting Black's Law Dictionary 188 (6th ed. 1990)). See also Seybold v. Magnolia Land Co., 376 So. 2d 1083, 1085 (Ala. 1979). Here, the contract expressly provided that the farmer, Mr. McGee, was "to furnish land, building, labor, litter, lights, water, heat and all equipment and facilities needed to keep the birds and produce eggs." (Contract ¶ B1.) McGee also promised to "give [his] best care and attention to the birds supplied by [the defendants]." (Contract ¶ B4.) McGee clearly violated those contractual obligations without offering any legal justification.[8] By his own admission, following the collapse of the number two chicken house's roof, the lights did not work, the feeders could not be used, and the water line for the automatic watering system was broken; all of which rendered the house nonfunctional for purposes of egg production. (See Earl McGee Dep. 53-56; Compl. ¶

---

[8] Although plaintiffs have not opposed summary judgment as to this issue and, therefore, have not sought to raise the excuse of impossibility or act of God, the Court notes that such an argument would be of no avail. Under Alabama law, "[w]here one by his contract, undertakes an obligation which is absolute, he is bound to perform within the terms of the contract or answer in damages, despite an act of God, unexpected difficulty, or hardship, because these contingencies could have been provided against by his contract." Alpine Constr. Co. v. Water Works Bd., 377 So. 2d 954, 956 (Ala. 1979). The Contract does contain a force majeure clause, but that provision excuses only NEPCO's failure to perform. (See Contract ¶ C6.)

17

11.)  Under long-standing Alabama law, a plaintiff may not

recover from a defendant under a contract which the plaintiff has

breached.  See Thomas v. Smoot, 56 So. 1, 1 (Ala. App. 1911).

Furthermore, plaintiffs, being unable to perform the Contract

following the collapse of their number two chicken house's roof,

could not demand continued performance by the defendants.  See

McGowin Lumber & Export Co. v. Camp Lumber Co., 77 So. 433, 436

(Ala. App. 1917).  "Under general principles of contract law, a

substantial breach by one party excuses further performance by

the other."  Nationwide Mut. Ins. Co. v. Clay, 525 So. 2d 1339,

1343 (Ala. 1988) (citing Smith v. Clark, 341 So. 2d 720 (Ala.

1977)).

Plaintiffs' claim of breach of a duty implied by law is

equally meritless.  According to the complaint, the breach of

duty was one implied by section 13A-11-14 of the Alabama Code.

(See Compl. ¶¶ 29-30.)  Section 13A-11-14 is a criminal animal

cruelty statute and does not expressly provide for a private

right of action nor did plaintiffs cite or this Court locate any

case law authorizing a private right of action under the statute.

See Ala. Code § 13A-11-14 (Ala. 1994).  Because no private right

of action is contemplated under the statute, defendants are also

entitled to judgment as a matter of law as to plaintiffs' claim

18

of breach of a duty implied by law.

**B.  Breach of Contract (Count III), Breach of Implied or Constructive Contract (Count IV), and Negligence (Count V)**

Together, the plaintiffs' claims for breach of contract (Count III), breach of implied or constructive contract (Count IV), and negligence (Count v), ask the question, "Why did the chicken not cross the road?"  Plaintiffs assert that the defendants had a contractual duty, more or less, to help the surviving chickens cross the road to safety after the collapse of the chicken house's roof by removing the birds from the damaged house and transporting them off the McGees' property.  The McGees claim that the defendants breached that duty by failing to remove the chickens from the damaged house.  According to the plaintiffs, then, the chickens did not cross the road because the defendants failed to properly fulfill their contractual obligations.

The Court begins by considering plaintiff's claim for breach of an express contract to remove the surviving chickens following the collapse of the chicken house's roof.  Under Alabama law, when the provisions of a contract are unambiguous, construction falls to the court and summary judgment may properly be granted. See Whitehall Dev. Corp. v. Nickelson, 689 So. 2d 865, 867 (Ala.

19

Civ. App. 1996). Here, the written terms of the Contract were clear. In the event of a material breach by the farmer, the Contract provided, in part, that NEPCO may terminate the Contract and that NEPCO may enter the farmer's premises and remove the remaining birds and supplies or it may endeavor to raise the birds on the farmers' premises. (See Contract ¶ C5.) In addition, the Contract provided that once the chickens had finished their normal laying cycle or become unprofitable, NEPCO may remove them and market them as it sees fit. (See Contract ¶ C7.) Although the Contract permitted the removal of the chickens in the event that the flock became unprofitable or in the event of a substantial breach of contract by Mr. McGee, it did not by its express terms mandate that the defendants remove the chickens under the circumstances of the present case.

Plaintiffs alternatively argue in Count IV, however, that even if the express terms of the Contract did not impose a duty on the defendants to remove the chickens after the damage to the chicken house, an implied or constructive contract arose from the obligations of both parties under the written Contract. (See Compl. ¶¶ 34-36.) Generally, though, an implied contract will not lie when an express contract exists covering the same subject. See Vardaman v. Florence City Bd. of Educ., 544 So. 2d

20

962, 965 (Ala. 1989).  See also Kennedy v. Polar-BEK & Baker
Wildwood Partnership, 682 So. 2d 443 (Ala. 1996) ("[C]laims of
both an express and an implied contract on the same subject
matter are generally incompatible.  This Court has recognized
that where an express contract exists between two parties, the
law generally will not recognize an implied contract regarding
the same subject matter.").  Even accepting that additional
implied terms or an implied contract would not be incompatible
with the express, written Contract under the facts of this case,
plaintiffs' argument is without support.

     The Court has already discussed certain terms of the
Contract.  Under additional terms, Mr. McGee was not to sell or
encumber the chickens or eggs; was to be present in person or
through a representative when chickens were delivered and
removed; and was to supply the moving and other equipment for
catching the chickens.  (See Contract ¶¶ B7, B14.)  NEPCO was to
actually deliver the birds along with the necessary supplies.
(See Contract ¶ A1.)  All live chickens were the Producer's
(NEPCO's) property.  (See Contract ¶ C4.)  From those provisions,
plaintiffs seek to create an implied or constructive duty on the
party of defendants to remove the chickens following the collapse
of the chicken house.  Plaintiffs' construction reads too much

between the lines of the printed Contract.

Certainly, defendants could have elected to remove their chickens from the McGees' farm pursuant to either paragraph C5 or paragraph C7 of the Contract, which are described above. However, they were not required to remove the birds, and the restrictions on Mr. McGee do not support an implication that the defendants were bound to remove the chickens following damage to the chicken house. In fact, the language of the Contract, particularly paragraphs C5 and C7, tends to support the opposite implication, that the defendants had no duty to retrieve the chickens and could keep them on the McGees' property even after the chicken house had collapsed. For example, paragraph C5 permitted the defendants to leave the chickens in place and raise them on the McGees' property following a material breach and termination of the Contract. (See Contract ¶ C5.) Paragraph C7 allowed the defendants to remove and market the chickens "as the PRODUCER [NEPCO] may deem desirable" but did not mandate removal after the birds became unprofitable. (Contract ¶ C7.) If any implied contract existed, it was to permit the defendants to leave the birds in place.

In Count V of their complaint, plaintiffs also asserted what is essentially a claim for negligent breach of contract, claiming

22

that defendants were negligent in not properly fulfilling their contractual duty to remove the surviving chickens.  (See Copl. ¶ 37.)  Alabama recognizes that one may breach a contract by virtue of the negligent performance of a contractual duty, and the action may be in contract or in tort.  See, e.g., Lambert v. Jefferson, 36 So. 2d 594, 596 (Ala. 1948).  The Alabama Supreme Court has given the following explanation of when one may bring a suit in contract or in tort following an alleged negligent breach of contract:

> [W]hen there is a contract expressed to exercise reasonable diligence in the performance of an act, or when there is a specific contract to do an act, a failure to exercise reasonable diligence on the one hand or to do the act on the other gives rise to an action of assumpsit.  But when the contract is to exercise reasonable care to perform the act, a failure to exercise such reasonable care may be redressed by either assumpsit or in tort.  When the contract does not in terms require reasonable care in doing the act stipulated to be done, the law imposes a duty--but does not imply a contract--to exercise due care in doing the act; and, therefore, when negligence exists in doing that act an action in tort only is available because there is no express or implied contract which is breached.

Waters v. American Cas. Co., 73 So. 2d 524, 529 (Ala. 1953) (citations omitted).  However, "[a] mere failure to perform a contract obligation is not a tort, and it furnishes no foundation for an action on the case."  C&C Prods., Inc. v. Premier Indus.

<u>Corp.</u>, 275 So. 2d 124, 130 (Ala. 1972).

Plaintiffs' claim for negligent breach or performance of contract is, in reality, nothing more than a restatement of their breach of contract claims from Counts III and IV. They simply assert that defendants did not remove the remaining chickens from the collapsed chicken house, as was their alleged duty under the Contract. Because the negligence claim simply alleges a failure to perform a contractual duty, a tort action will not lie. <u>See</u> <u>id.</u> Furthermore, even if a tort claim could properly be pleaded, plaintiffs have not shown a breach of any duty, as the Court has already concluded that defendants did not owe the plaintiffs any duty under the Contract or implied by law to remove the chickens from plaintiffs' collapsed chicken house.

In conclusion, plaintiffs' related contract and negligence claims contained in Counts III through V must fail as a matter of law because the Contract did not impose upon the defendants the duty that plaintiffs alleged was breached. Summary judgment in favor of defendants is warranted.

## C. Nuisance (Count VII)

Plaintiffs' final claim is one for nuisance. In their complaint, the McGees assert that the strong odors accompanying the decomposition of the dead chickens on their property created

24

a nuisance for which the defendants are ultimately responsible.
(See Compl. ¶¶ 46-47.)  The defendants have countered, in their
summary judgment brief, that any nuisance was created by the
McGees' failure to dispose of the deceased birds, which under the
terms of the Contract became Mr. McGee's property upon their
death.  (See Defs.' Br. 8-9.)  In response, plaintiffs have
argued that a jury could find that NEPCO owed plaintiffs a duty
to dispose of the birds, that NEPCO breached that duty, and that
NEPCO's breach injured the McGees.  (See Pls.' Br. 14-15.)  The
answer to this nuisance question may be found by answering the
query, "Whose dead chicken is it, anyway?"

     Although the question just posed, as noted earlier, is
phrased irreverently, the response to that query does determine
the outcome of the nuisance issue in this case.  The nuisance
doctrine is based upon the maxim "sic utere tuo ut alienum non
laedas," commanding one to use his or her own property in such a
manner as not to harm others; this basic principle applies to
both parties to a nuisance action.  See Beam v. Birmingham Slag
Co., 10 So. 2d 162, 166 (Ala. 1942).  In Alabama, a nuisance is
statutorily defined as follows:

     A "nuisance" is anything that works hurt, inconvenience
     or damage to another.  The fact that the act done may
     otherwise be lawful does not keep it from being a

nuisance.  The inconvenience complained of must not be
fanciful or such as would affect only one of a
fastidious taste, but it should be such as would affect
an ordinary reasonable man.

Ala. Code § 6-5-120 (1993).  This statutory definition is simply

a codification of the common law concept of nuisance, and does

not alter the common law principles of nuisance in the state of

Alabama.  See Milton v, Maples, 179 So. 519, 519 (Ala. 1938).

Therefore, a nuisance claim "must comport with the classical tort

concepts of duty and causation" which require the plaintiff to

show a breach of duty by the defendant, the natural and

foreseeable consequences of which proximately caused the

plaintiff's injury.  Tipler v. McKenzie Tank Lines, 547 So. 2d

438, 440-41 (Ala. 1989).  See also Jackson v. USX Corp., 659 So.

2d 21, 24 (Ala. 1994); Hilliard v. City of Huntsville Elec. Util.

Bd., 599 So. 2d 1108, 112-13 (Ala. 1992); Terrell v. Alabama

Water Serv. Co., 15 So. 2d 727, 728 (Ala. 1943) ("Negligence and

nuisance are distinct torts.  They may be different in their

nature and consequences.  But in either event there must be a

breach of duty owing by defendant to plaintiff.").  Although the

traditional concepts of duty and causation are closely associated

with negligence, a nuisance need not be based solely upon

negligent actions; the underlying conduct may be lawful,

26

unintentional, intentional, or negligent so long as it results in
injury to another.  See Tipler, 547 So. 2d at 440.  However, the
complementary concept of contributory negligence generally
applies only when the nuisance claim "is inherently based on
negligence."  See Terrell, 15 So. 2d at 730-31.

The common law underpinnings of nuisance law anticipate a
plaintiff's injury arising from the defendant's use of that
defendant's own property.  See Beam v. Birmingham Slag Co., 10
So. 2d 162, 166 (Ala. 1942) (discussing the maxim "sic utere tuo
ut alienum non laedas").  That idea is carried forward in the
statutory definition of a "nuisance" as "anything that works
hurt, inconvenience or damage to another."  Ala. Code § 6-5-120
(1993) (emphasis added).  It follows logically, therefore, that
one may not claim a nuisance arising from one's use of one's own
property.  However, that is what plaintiffs seek to do in this
case.  The Contract explicitly provided that "all mortality shall
become property of CONTRACTOR [Mr. McGee], and it shall be
CONTRACTOR'S [Mr. McGee's] responsibility to dispose of dead
birds in a sanitary manner and in accordance with applicable
health laws."  (Contract ¶ C4.)  Because the contract
specifically provided that McGee was the owner of all dead birds
and was the party responsible for their disposal, plaintiffs

27

cannot, consistent with the elementary principles of nuisance law, recover from defendants on this claim.

Furthermore, plaintiffs' charge of nuisance does not "comport with the classical tort concepts of duty and causation." See Tipler, 547 So. 2d at 440. The McGees have not shown any duty on the part of the defendants either to remove the live chickens following the collapse of the chicken house roof or to dispose of the dead chickens. See Jackson v. USX Corp., 659 So. 2d 21, 24 (Ala. 1994) (finding no evidence of a duty by defendant to perform the act, the failure of which to perform allegedly resulted in a nuisance). The Court has already concluded that the defendants had no contractual duty to remove the live chickens or to dispose of the dead birds. However, plaintiffs had not only a contractual duty but also a statutory duty to properly dispose of the dead chickens. Under section 3-1-28 of the Alabama Code, "all owners or custodians of animals which die or are killed in their possession or custody, other than such as are slaughtered for food," must bury or incinerate the carcasses within twenty-four hours. Ala. Code § 3-1-28 (1996). Alabama law clearly places the burden of disposal on the party in possession of the animals, whether the owner or a mere custodian. Here, that party was Mr. McGee.

Certainly the defendants owed no duty to dispose of the dead
birds but even if the defendants owed and breached a duty to
remove the remaining live chickens following the collapse of the
roof, plaintiffs could not establish the causal link between the
supposed breach and the plaintiffs' injuries necessary to hold
defendants liable.  The plaintiffs chief injuries consisted of
enduring the odors and complaints associated with the decay of
the chickens.  However, the failure to remove the live chickens
from the premises did not cause those injuries.  The injuries
were caused by the failure to dispose of the chicken carcasses,
and that responsibility fell on plaintiffs.

In short, the plaintiffs cannot recover from the defendants
under a nuisance theory because any nuisance was the result of
the plaintiffs' actions rather than the defendants' conduct.   The
dead chickens, which produced the odors of which the McGees
complained, were their property.  The McGees also had the sole
responsibility under both the Contract and under statute to
dispose of the rotting poultry.  Because both the dead chickens
and the burden of disposing of the carcasses belonged to
plaintiffs, the Court concludes, as a matter of law, that
plaintiffs could not prevail upon their nuisance claim and that
summary judgment in favor of the defendants, therefore, is proper

29

as to this issue.

## 3.  Defendant NEPCO's Counterclaims

After removal, defendant NEPCO asserted two counterclaims against Earl McGee.  The original counterclaim was premised upon a breach of contract.  (See Countercl. ¶¶ 11-12.)  Later, NEPCO amended its counterclaim, adding a second count seeking indemnification and reimbursement for certain litigation-related expenses.  (See June 23, 1999 Mot. ¶¶ 2-3; Am. Countercl. ¶¶ 14-15.)  The plaintiffs' brief in opposition to the defendants' July 19, 1999 motion for summary judgment raised a cross-motion for summary judgment as to the counterclaims.  (See Pls.' Br. 1.)  The Court will consider each counterclaim in turn.

## A.  Breach of Contract

The Court has already concluded that Mr. McGee breached the provisions of his contract with NEPCO obligating him to shelter and care for the chickens in his possession.  However, the mere fact of breach does not entitle the other party to recover on a contract claim.  One must also show actual damages arising from the breach.  See Purcell Co., Inc. v. Spriggs Enters., Inc., 431 So. 2d 515, 523 (Ala. 1983) ("Absent proof of actual damage or injury, there can be no recovery for breach of contract.  Because we find no damage done plaintiffs in this case under the evidence

30

of record . . . this [count] should not have gone to the jury.")
(citations omitted). See also Cocke v. Odom, 385 So. 2d 1321,
1322 (Ala. Civ. App. 1980) (stating that to recover for a breach
of contract, the plaintiff must show the existence of an
agreement, a breach by the defendant, and the existence of
damages). Furthermore, those damages must be the natural and
proximate consequences of the breach. See West v. Friday, Inc.,
403 So. 2d 213, 214 (Ala. 1981); Taylor v. Parker, 660 So. 2d
1002, 1004 (Ala. Civ. App. 1995) (quoting Brendle Fire Equip.,
Inc. v. Electronic Eng'rs, Inc., 454 So. 2d 1032, 1034 (Ala. Civ.
App. 1984)). NEPCO's counterclaim alleges damages from the loss
of 16,000 laying hens, the loss of egg production from the 16,000
birds, and expenses incurred in removing approximately 4,000
birds. (See Countercl. ¶ 12.) The Court first addresses the
claimed losses associated with the birds not removed from the
damaged house.

After careful consideration, the Court concludes that NEPCO
is not entitled to any recovery as to the chickens not removed
from the house following the collapse of the roof because any
injury suffered was not the proximate result of any breach by Mr.
McGee but was the direct result of the failure of NEPCO's field
man, Freddy Early, to either carry out the instructions that he

31

had received from NEPCO management or to report his lack of

progress to NEPCO.  The uncontroverted evidence tends to show

that all of the chickens survived the collapse of the chicken

house's roof unscathed.  (See Earl McGee Dep. 47, 50-51.)  NEPCO

then began efforts to mitigate its damages by removing

approximately 2200 birds and by slaughtering roughly 800

additional chickens.  (See Earl McGee Dep. 59-62, 73-74, 76-77.)

The work then stopped either because the work crew quit over low

wages or because the collapsed house was too unsafe.  (Compare

Earl McGee Dep. 76-77 with Freddy Early Dep. 20-21 and June 17,

1999 Johnny Jacobs Dep. 30.)  At any rate, Early, the field man,

reported his progress to NEPCO's general manager, Johnny Jacobs;

Early informed Jacobs that no more birds could be removed at that

time but that Mr. McGee was to remove the roof and that more

birds could then be rescued.  (See June 17, 1999 Johnny Jacobs

Dep. 39-30.)  Jacobs instructed Early to "just get [the birds]

out of there . . . ."  (June 17, 1999 Johnny Jacobs Dep. 30.)

NEPCO's understanding, gained through conversations with Early,

was that Mr. McGee would remove the roof and that the remainder

of the chickens would then be removed.  (See June 17, 1999 Johnny

Jacobs Dep. 31.)

Early, however, never followed through and did not report to

32

NEPCO that the birds had not been removed until more than three
months later. (<u>See</u> June 17, 1999 Johnny Jacobs Dep. 36-37.)
Early's inaction was not entirely without reason. He testified
that he believed that the weather conditions were unfavorable for
removing the roof; that Mr. McGee was in no rush to have anything
done regarding the collapsed roof; that the chickens would
probably die before the roof could be removed; and that the
remaining chickens would have minimal salvage value, even if
successfully rescued. Furthermore, he intimated to Mr. McGee
that the chickens would quickly die. (Freddy Early Dep. 22-24,
29-30.) However, the chickens did not die quickly; all of the
chickens that had been left in the collapsed house were still
alive three weeks later. (<u>See</u> Earl McGee Dep. 82.) Yet, not
until May of 1998 did Early ever order Mr. McGee to clear the
debris from the fallen roof. (<u>See</u> Earl McGee Dep. 100-03; Freddy
Early Dep. 32-33, 37.) The removal, which was done in exchange
for the salvaged roofing materials, took about three weeks[9] and
was completed by June. (<u>See</u> Earl McGee Dep. 70, 99, 103-04;
Freddy Early Dep. 26.)

---

[9] Progress was episodic as the workers "would have to quit
and leave" because of the combination of hot weather, flies, and
odor. (<u>See</u> Earl McGee Dep. 103.)

33

This uncontroverted evidence establishes that Early made his own assessment of the situation on the McGee farm and did not heed the initial instructions given to him by NEPCO's general manager, Johnny Jacobs, to remove all of the surviving birds from the damaged house or even inform NEPCO's management of his own conclusions regarding the feasibility of rescue and request new instructions. Immediately following the collapse of the roof, all of the birds appeared to be alive and none died for at least three weeks, which was the approximate amount of time that removal of the roof eventually took. No evidence was proffered to even suggest that Early was at liberty to alter or disregard the orders from NEPCO to remove the birds while they were still alive, nor was any evidence offered that it was impossible during the three weeks following the accident to clear the fallen roof and rescue the surviving birds.[10] Given that Early had been instructed to arrange for the removal of the roof and for the rescue of the surviving chickens yet failed to do so in a timely

---

[10] Although Early testified that the weather was cold and rainy during the three weeks following the collapse of the roof and that he did not expect Mr. McGee to clear the debris during that time, no testimony suggests that the weather would have made removal of the damaged roof impossible during that entire period. (See Freddy Early Dep. 23.) The evidence tends to establish, at most, a two day delay. (See June 17, 1999 Johnny Jacobs Dep. 30.)

34

manner, the Court finds as a matter of law that any losses
relating to the chickens left in the collapsed house were not the
proximate result of Mr. McGee's breach of the Contract but of
Early's failure to carry out his instructions from NEPCO.  See
West v. Friday, Inc., 403 So. 2d 213, 214 (Ala. 1981) (stating
the general rule that damages must be proximately related to the
alleged breach of contract).

NEPCO also counterclaimed for the expenses incurred in
removing chickens from the collapsed house.  (See Countercl. ¶
12(c).)  NEPCO, however, has introduced no evidence supporting
its claim for damages; it has offered no invoices, testimony, or
affidavits to even suggest that it incurred any additional
expenses in moving the chickens after the collapse of the roof
above what it would have otherwise incurred in performing the
Contract.  In fact, NEPCO has not attempted to show that it
incurred any expense in moving the chickens, let alone
demonstrate even the possibility of a foundation from which a
rational trier of fact could make an estimate of damages.  See
Mason & Dixon Lines, Inc. v. Byrd, 601 So. 2d 68, 70-71 (Ala.
1992) (stating that one attempting to prove damages from a breach
of contract must provide a foundation from which the trier of
fact can at least reasonably estimate the level of damages).

Without a showing of some actual damages relating to the moving
of the surviving birds, NEPCO cannot prevail on this aspect of
its breach of contract counterclaim because of the fundamental
requirement that recovery for breach of contract may not be had
in the absence of a demonstrable injury to the non-breaching
party. See <u>Spivey v. Bob Youngblood Cars, Inc.</u>, 646 So. 2d 6, 8
(Ala. 1994) ("In order to recover damages, a plaintiff must
present evidence of an actual loss, for damages are not a matter
merely of conjecture."); <u>Purcell Co., Inc. v. Spriggs Enters.,
Inc.</u>, 431 So. 2d 515, 523 (Ala. 1983). <u>See also</u> <u>Jones v. Quality
Dev. Co., Inc.</u>, 671 So. 2d 744, 747 (Ala. Civ. App. 1995).

     To summarize, NEPCO is not entitled to summary judgment on
its counterclaim for breach of contract despite the absence of
any material issues of fact because the counter-claimant is not
entitled to judgment as a matter of law. As to the birds not
rescued from the chicken house, any damages suffered by the
counter-claimant were not proximately caused by Mr. McGee's
breach of the Contract, and as to the expenses allegedly incurred
in moving some birds, the counter-claimant did not proffer any
evidence supporting the existence of any actual damages. For the
same reasons that judgment as a matter of law must be denied
NEPCO, however, the Court finds that cross-movant Earl McGee is

entitled to judgment as a matter of law as to the counterclaim
for breach of contract.

## B. Indemnification and Defense Costs

Defendant NEPCO's second counterclaim seeks reimbursement of
certain defense-related expenses under an indemnification clause
in the Contract. (See June 23, 1999 Mot. ¶¶ 2-3; Am. Countercl.
¶¶ 14-15.) Specifically, NEPCO claims that under the terms of
the Contract, it is entitled to reimbursement for the costs and
attorney fees incurred in defending the contract claims asserted
by Mrs. McGee and for the cruelty to animals, outrage, and
nuisance claims by both McGees. (See Defs.' Br. 11-12.) The
McGees contend that the indemnification clause does not apply to
the present dispute. (See Pls.' Br. 17-19.) The Court agrees
with the McGees' ultimate conclusion.

The provision in question provided that the farmer or
Contractor, Mr. McGee, would indemnify the Producer (NEPCO)
"against all claims, suits and judgments for property damage and
personal injury incurred by any property owner or resident in the
vicinity of [the McGee] premises and from and against [the]
expense of defending such claims and suits, including court costs
and attorney's fees." (Contract ¶ B18.) When, as here, a
contractual clause is unambiguous, its interpretation is a job

37

for the courts.  See, e.g., Dill v. Blakeney, 568 So. 2d 774, 777
(Ala. 1990) (stating the general rule that "when the terms of a
contract are unambiguous, the construction of the contract and
its legal effect become questions of law for the court").  In
construing the indemnification agreement, "in the vicinity of" is
the key phrase.

In ordinary usage, the term "in the vicinity of" denotes an
area or region surrounding, adjacent to, or near but not
necessarily entirely contiguous to a particular location.  See
Merriam Webster's Collegiate Dictionary 1316 (10th ed. 1996);
Webster's New Collegiate Dictionary 1304 (1977); The Random House
College Dictionary 1466 (1973); Black's Law Dictionary 1738 (rev.
4th ed. 1968) (all defining "vicinity").  Giving the phrase "in
the vicinity of" its normal meaning, the indemnification clause
includes suits brought by property owners and residents occupying
property in the general area surrounding the McGees' farm but
excludes any actions by the McGees themselves, as they are the
owners and residents of their own premises and not property
adjacent or in proximity to their premises.  This construction of
the indemnification clause comports not only with the accepted
meaning of the word "vicinity" but also with the canon of
contract law requiring courts construing a contract to give

38

"[w]ords used in a contract . . . their ordinary, plain, or natural meaning where nothing appears to show they were used in a different sense or that they have a technical meaning." Ex parte Dan Tucker Auto Sales, Inc., 718 So. 2d 33, 36 (Ala. 1998).

Simply put, the phrasing of the indemnification clause excludes the McGees from its scope.  Because the indemnification clause does not embrace any of the claims brought by plaintiffs, defendant NEPCO's second counterclaim must also fail.  As no issues of material fact remain as to this counterclaim and plaintiffs are entitled to judgment as a matter of law, summary judgment in favor of Earl McGee on NEPCO's counterclaim for indemnification and reimbursement of litigation costs is due to be granted.

## 4.  Conclusion

In summary, the Court finds that no material issues of fact exist as to plaintiffs' pending claims and that defendants NEPCO and Tyson are entitled to judgment as a matter of law as to all remaining claims asserted by plaintiff.  Furthermore, the Court concludes that no genuine issues of material fact exist as to defendant NEPCO's counterclaims and that plaintiff Earl McGee is entitled to judgment as a matter of law as to both of NEPCO's counterclaims.  A separate order consistent with the findings and

39

conclusions set forth in this memorandum of decision will be entered.

DONE this 27th day of January, 2000.

_____
SENIOR UNITED STATES DISTRICT JUDGE